**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF ) | |
| THE FOLLOWING PROPERTIES: ) | |
| A ) | |
| All monies and other things of value, ) | **UNDER SEAL** |
| up to $90,000.00, in J.P. Morgan Chase ) | |
| account number XXXXX3103, held in the ) | |
| name of RVT Automotive Group LLC ) | |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANTS**

I, Gordon Cummings, being duly sworn, depose and state:

**INTRODUCTION**

1. I have been a Special Agent with Immigration Customs Enforcement ("ICE") Homeland Security Investigations ("HSI") since 2010. Prior to joining HSI, I was a Special Agent with the General Services Administration ("GSA") Office of the Inspector General from 2000 through 2010. Since 2000, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white collar crimes, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the laundering of criminal proceeds, and the organization of conspiracies. In the course of conducting investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; supporting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing financial records; conducting electronic surveillance; and preparing and executing search warrants.

2. I base the facts set forth in this affidavit upon my personal knowledge, information obtained during my participation in this investigation, review of documents to include business and bank records and official government records, knowledge obtained from other individuals

including law enforcement personnel, and communications with others who have personal knowledge of the events and circumstances described herein. Because this affidavit is being submitted for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue a seizure warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the legal basis for the issuance of a seizure warrant.

3. As further described below, this affidavit is made in support of an application for funds traceable to proceeds from wire fraud and funds involved in actual and attempted money laundering offenses, in violation of 18 U.S.C. §§ 1343, 1349, 1956(a)(1)(B)(i) and (h), and 1957.

## I. APPLICABLE LAW

### Wire Fraud

4. Title 18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," shall be guilty of a federal offense. Section 1349 criminalizes a conspiracy to commit such offense.

### Money Laundering

5. Title 18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed

in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" shall be guilty of a federal offense. This offense is sometimes referred to as concealment money laundering. The term "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1), and it includes violations of 18 U.S.C. § 1343 (wire fraud).

6. Title 18 U.S.C. § 1957 provides in relevant part that "[w]hoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity" shall be guilty of a federal offense.

7. Title 18 U.S.C. § 1956(h) punishes any conspiracy to violate 18 U.S.C. § 1956 or 18 U.S.C. § 1957.

**Asset Forfeiture Statutes**

8. The proceeds of wire fraud are subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to civil forfeiture. In addition, 28 U.S.C. § 2461(c) provides that, "[i]f a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," then the government can obtain forfeiture of property "as part of the sentence in the criminal case." Thus, pursuant to 28 U.S.C. § 2461(c) and 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to criminal forfeiture.

9. Property involved in a money laundering offense is subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property, is subject to civil forfeiture. In addition, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property, is subject to criminal forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime. These forfeitures encompass all property "involved in" the crime, which can include untainted funds that are comingled with tainted funds derived from illicit sources.

10. Further, 18 U.S.C. § 984 allows the United States to seize for civil forfeiture identical substitute property found in the same place where the "guilty" property had been kept. For purposes of Section 984, this affidavit need not demonstrate that the funds now in Robert Gallant's account are the particular funds involved in the wire fraud and money laundering violations, so long as the forfeiture is sought for other funds on deposit in that same account. Section 984 applies to civil forfeiture actions commenced within one year from the date of the offense.

11. This application seeks a seizure warrant under both civil and criminal authority because the property to be seized could be placed beyond process if not seized by warrant.

12. Pursuant to 18 U.S.C. § 981(b), property subject to civil forfeiture may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture. A civil forfeiture

action may be brought in any district where "acts or omissions giving rise to the forfeiture occurred." 28 U.S.C. § 1355(b)(1)(A). As detailed below, acts or omissions in furtherance of the fraud and money laundering conspiracy under investigation occurred in the District of Columbia. The criminal forfeiture statute, 18 U.S.C. § 982(b)(1), incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for a criminal forfeiture action. 21 U.S.C. § 853(f) provides authority for the issuance of a seizure warrant for property subject to criminal forfeiture.

## II. PROBABLE CAUSE

13. In October of 2016, the HSI Financial Investigations Group initiated an investigation into Ruth Abella ("Abella"), a Washington D.C. resident, for suspected violations of 18 U.S.C. § 1956 (money laundering) and 31 U.S.C. § 5324 (structuring). The investigation has led to the discovery of a large-scale wire fraud and money laundering conspiracy active in Washington, D.C., Florida, Texas, and other locations. This affidavit outlines probable cause to seize funds that represent proceeds of wire fraud and funds involved in actual or attempted money laundering offenses, which conspirators intended to use to purchase and export two Land Rover vehicles in an apparent attempt to transfer their illicit proceeds overseas. The funds are currently held in JP Morgan Chase Bank account number ending in 3103 (the "Target Account").

### Ruth Abella and the Gary Baros Online Fraud Scheme

14. A review of Bank of America and Wells Fargo records for accounts in Abella's name (opened in Washington, D.C.) showed that between February 2014 and September 2016 there were more than $760,000 in suspicious deposits, often in the form of cash and wire transfers deposited in various states across the country, with no known legitimate origin. The suspicious deposits were frequently followed by rapid cash withdrawals (including cash withdrawals in

Washington, D.C.) and international wire transfers in matching amounts. The practice of receiving cash deposits into a bank account from geographically diverse locations and rapidly withdrawing the funds is sometimes referred to as a "funnel account." Based on my training and experience, I am aware that funnel accounts are often used to launder and rapidly move cash proceeds generated from illicit activity.

15. On January 17, 2017, I conducted a telephone interview with Witness 1, in relation to a deposit made by Witness 1 into Abella's Bank of America account on February 3, 2016. Witness 1 stated that she made the deposit at the request of an individual using the name Gary Baros ("Baros"), whom she met online through the dating website eHarmony. Witness 1 provided the following further information. Baros requested $5,000, allegedly in connection with a business deal in Dubai. Baros provided Witness 1 with Abella's bank account information for the deposit. Baros described Abella as a housekeeper who was taking care of his paralyzed mother. After Witness 1 deposited only $1,600 instead of $5,000, Baros confronted her and threatened physical violence. Subsequent to this incident, Witness 1 wrote a letter to Abella advising her of the scheme and stating that Witness 1 was going to report Abella to the FBI. Witness 1 never received any response from Abella. Based upon the information provided by Witness 1, I believe Witness 1 was a victim of an online romance fraud scam, and Abella was allowing her account to be used as a funnel account to launder the illicit funds. Witness 1 e-mailed me purported photographs of Baros and other documents she received from Baros in the course of the fraud scheme.

16. On February 16, 2017, I interviewed Abella in conjunction with a border search conducted at Ronald Reagan National Airport, in Arlington, Virginia, after Abella arrived on an

international flight from Toronto, Canada.  During this interview, Abella denied ever sending money overseas, receiving money from overseas, or receiving any domestic wire transfers.

17. On February 24, 2017, I conducted a voluntary interview of Abella at her residence in Washington, D.C.  Contrary to her earlier denials, Abella admitted to receiving money from unknown individuals into her Wells Fargo and Bank of America accounts and transferring the funds overseas.  Abella stated that she did so upon instructions from a person claiming to be Kendrick Nestor ("Nestor"), an individual she met on Facebook.  Abella was asked if she received money from Witness 1 or received a letter from Witness 1.  Abella denied receiving money or receiving a letter from Witness 1.

18. Abella was also questioned about transactions involving a second individual, Witness 2.  Bank account records showed that Abella received a $20,000 wire transfer from Witness 2 on August 12, 2015 and an $18,000 wire from Witness 2 on August 20, 2015, into her Bank of America account in Washington, D.C.  Abella admitted to receiving money from Witness 2.  Abella stated that Nestor would text her and to let her know that Witness 2 had deposited money into her account.  Abella would then wire the money to Nestor.

19. On March 21 and 22, 2017, I interviewed Witness 2 regarding her deposits into Abella's Bank of America account.  Witness 2 stated that she made these transfers at the request of Gary Baros, an individual she met online through eHarmony.  Witness 2 described an online fraud scheme substantially similar to that described by Witness 1.  Witness 2 also provided me with photographs she received from Baros, which appear to show the same individual as in the photographs supplied by Witness 1.  In total, Witness 2 claimed she sent approximately $200,000

to Baros, either through Abella's account or, as described more fully below, through other accounts.

20. Subscriber information obtained by grand jury subpoena for three e-mail accounts associated with Gary Baros show that the e-mail accounts were registered from Internet Protocol ("IP") addresses in Nigeria and South Africa.

21. Based on the above-referenced facts, I believe that "Gary Baros" is a fictitious online persona used to perpetrate a large-scale online romance fraud scheme involving numerous victims, including Witness 1, Witness 2, and many others. The Gary Baros fraud scheme uses money launderers based in the United States to receive and launder fraud proceeds, including by transferring the proceeds overseas. One of the money launderers used in the scheme was Abella, in Washington, D.C., who received and laundered fraudulent payments from both Witness 1 and Witness 2, among others. As explained in further detail below, the investigation has identified a network of additional accounts and money launderers involved in the Gary Baros fraud scheme.

### Additional Transactions Involving Witness 2 and Gary Baros Online Fraud Scheme

22. When interviewed, Witness 2 claimed to still be in communication with Baros, and she described several additional transactions in connection with the Gary Baros fraud scheme.

23. Witness 2 stated that she sent over $100,000 to a Bank of America account number ending in 9923, located in De Leon Springs, Florida and held in the name of Robert Gallant ("Gallant"), based on instructions from Baros. Witness 2 stated that she believed Gallant was Baros's attorney. On March 27, 2017 this Court issued a seizure warrant for the Bank of America account in the name of Gallant. *See In the Matter of the Seizure of All Monies and Other Things*

*of Value in Bank of America Checking Account Number xxxxxxxx9923 Held in the Name of Robert Gallant*, D.D.C. Docket Number 1:17-mj-169 (Hon. R. Meriweather) [SEALED].

24.     In addition, Witness 2 claimed to have wired $20,000 to Azteca Logistics at the direction of Baros.  A review of bank account records for the Azteca Logistics account revealed the following:  Alberto Nunez ("Nunez") was listed as the owner of Azteca Logistics, located in Pearland, Texas and was also listed as the signer of the account; the account received a $20,000 domestic wire transfer deposit from Witness 2 on February 1, 2017; the funds received from Witness 2 were subsequently withdrawn in cash increments from several banks in Pearland, Texas; in addition, the Azteca Logistics account received a $60,000 international wire transfer from a company in Taiwan on January 13, 2017 and a domestic wire transfer in the amount of $46,000 was wired from Azteca Logistics to an account in the name of Celtab Inc. on January 18, 2017.

25     Finally, review of additional financial records showed that Witness 2 wired $17,000 into a Bank of America account number ending in 0941, held in the name of Vandex Construction LLC, on or about February 8, 2017.

26.     As explained below, both the Azteca Logistics account and the Vandex Construction LLC account are linked to an individual identified as Henry Jegede ("Jegede").

### Identification of Jegede in Connection with Fraud and Money Laundering Scheme

27.     On April 18, 2017, I conducted a voluntary interview of Nunez at his residence in Pearland, Texas, regarding the Azteca Logistics account.  Nunez provided the following information:  Nunez admitted to withdrawing the $20,000 in cash increments at several banks in Houston, Texas (corresponding to the $20,000 wire transfer from Witness 2).  Nunez stated he withdrew the money at the direction of a Nigerian man named Carl, later identified as Jegede.

9

Nunez stated that he and Jegede went to banks in Houston and Pearland, Texas to withdraw the money. Nunez stated that Jegede allowed Nunez to keep $3,000 out of the $20,000, which Nunez claimed he used to pay for a new car engine and for living expenses, while Jegede kept the rest of the money. Nunez provided me with Jegede's cell phone number: (832) 877-8272. The telephone was queried through open sources and law enforcement databases, confirming the subscriber of the phone number as Henry Jegede. Nunez also provided a "selfie" video recording of Jegede filming himself while driving a car. The video was on Nunez's cell phone. I queried Jegede through immigration databases. The query revealed Jegede is a citizen of Nigeria who entered the United States on an F1 student visa. I reviewed the photograph of Jegede contained in the immigration database. The photo of Jegede in the immigration database matches the person in the video provided by Nunez. A further review of immigration records revealed that Jegede's F1 visa has expired and he is illegally present in the United States.

28. Nunez stated that Jegede is part of a group of Nigerian males (hereinafter referred to as the Nigerian Group) who live in the Houston, Texas area, drive expensive cars, and live lavish lifestyles. Nunez stated that the members of the Nigerian Group do not have jobs and live off of their family member's money. Nunez provided me with the first names/alias names and cell phone numbers of the Nigerian Group. I queried the information provided by Nunez through immigration and law enforcement databases. Based on the queries conducted, the additional members of the Nigerian Group were identified as Adava Oniwon ("Oniwon"), Dare Oliyide ("Oliyide"), and Sunday Agbolade ("Agbolade"). Immigration records revealed that these three individuals are citizens of Nigeria. Oniwon is a legal permanent resident; Oliyide is present on an expired F1 visa; and Agbolade is present on an F1 visa.

10

29.     Nunez stated that he was introduced to Jegede and the other members of the Nigerian Group through his former neighbor, the individual identified as Oliyide. According to Nunez, the Nigerian Group told him he could make good money by letting the family members of the Nigerian Group deposit money into Nunez's bank account, so that the money could be transferred to Oniwon. Nunez stated he received a "cut" from each deposit into his account.

30.     Nunez stated that Nigerian Group directed him to set up business bank accounts with Bank of America and Chase bank under the name Azteca Logistics. Nunez stated that the Nigerian Group told him that more money could be deposited if the accounts were opened as business accounts. Nunez stated that the Nigerian Group deposited approximately $200,000 into his Chase bank account. Nunez stated that between his Bank of America and Chase Bank accounts, he personally retained $10,000, which Nunez used for travel, living expenses, and child support.

31.     When questioned about the wire transfers discussed above, Nunez admitted to sending a $46,000 wire transfer to Celtab Inc. at the direction of Jegede. Nunez stated he did not receive a "cut" from this wire transfer. I queried Celtab Inc. and discovered the company is based in Louisville, Kentucky and Madison, Indiana and operates as a tobacco exporter. A query of U.S. Customs export records showed numerous tobacco exports from Celtab Inc. to companies based in Nigeria. Based on my training and experience, I know that the payment to Celtab Inc. is consistent with trade-based money laundering techniques. Trade-based money laundering is the practice of using illicit proceeds to purchase goods used in international trade, which obscures the illegal source of the funds and can be used to transfer value to recipients in other countries without using the formal financial system.

32. On May 4, 2017, Nunez provided me with copies of text messages between him and Jegede. A review of the text messages revealed Jegede directing Nunez to send wire transfers. For example, Nunez received the following text messages from Jegede, using the telephone number (832) 877-8272:

> "25k to account xxxxxxxx6588, Bank: Bank of America, Account Name: Nkechi Igbo, Address: 6309 Westchester Lane NE Atlanta, Georgia 30345."

> "$46,000, Beneficiary Bank Name: MainSource Bank, Beneficiary, Celtab, Account Number, xxxxx8317, Business Address: 2900 Wilson Avenue Madison, IN 47250."

### Suspected Fraud Involving Vandex Construction Account

33. Your Affiant conducted additional queries of Jegede's cell phone number (832) 877-8272 through law enforcement databases. The query revealed Jegede's cell phone number was listed as a telephone number of Vandex Construction LLC, located in Houston, Texas. Further research using open source and law enforcement databases revealed the following: Vandex Construction has addresses at 13101 Briar Forest Drive, #3203, Houston, Texas and 14402 W. Bellfort Blvd., Sugarland, Texas; the owner of the company is identified as "David Johnson"; and the business was incorporated on December 20, 2016. Based on further research through open source and law enforcement databases, "David Johnson" appears to correspond to an individual with an address at 13101 Briar Forest Drive, #3203, Houston, Texas, who has multiple felony convictions for auto theft, burglary and resisting arrest. As explained in further detail below, however, I believe that Jegede used the identity of "David Johnson" as a false alias to establish and control the Bank of America account number ending in 0941, held in the name of Vandex Construction LLC.

12

34. On May 11, 2017, I spoke to a Bank of America representative who stated that in the past 13 months there were 66 deposits into Bank of America account number ending in 0941, held in the name of Vandex Construction LLC, totaling $583,408, including $47,000 in cash deposits. During the same time period, there were withdrawals totaling $492,836, including $202,377 in cash withdrawals. Financial records obtained from Bank of America do not show expenditures that would be expected from a legitimate construction company, such as payroll or purchases of construction materials. Moreover, as noted above, Witness 2 wired $17,000 into the Vandex Construction account in or about February 2017, apparently in connection with the Gary Baros online romance fraud scheme. Based on the foregoing, and based on my training and experience, I believe the Vandex Construction account was operating as a funnel account to launder the proceeds of illicit activity, including illegal proceeds from Gary Baros online romance fraud scheme.

35. According to information from Bank of America, on May 11, 2017, a PNC Bank customer sent a wire transfer in the amount $85,000 into the Vandex Construction Bank of America account. An individual identifying himself as "David Johnson" then telephoned the Bank of America customer service telephone number and requested that the money be returned to the PNC Bank customer, explaining that the transaction had been sent in error. "David Johnson" provided a call-back number of (832) 877-8272, which corresponds to Jegede's cell phone number. The Bank of America Fraud Representative telephoned "David Johnson" at (832) 877-8272 and advised him that he would have to go to a Bank of America branch in person and request that the funds be returned.

36.     On May 12, 2017, "David Johnson" went to a Bank of America location and requested that the $85,000 be returned to the PNC customer. After the money was returned, the PNC customer subsequently transferred $85,000 into a different Bank of America account, held in the name of Sentrix Construction LLC. The authorized signer for the Sentrix Construction LLC account was "Michael Adams." The Bank of America Fraud Representative spoke via telephone to the PNC customer, who stated that the $85,000 was for an unidentified investment. Based on this information, the Bank of America Fraud Representative believed the PNC Bank customer to be victim of fraud, and placed a hold on the Sentrix Construction account. Meanwhile, on or about May 11 and 15, 2017, a second Sentrix Construction LLC account received wire transfers totaling $300,000, from a Charles Schwab customer. The Bank of America Fraud Representative spoke via telephone to the Charles Schwab customer, who stated that the $300,000 was for an investment. The Bank of America Fraud Representative contacted "Michael Adams," the signer of the Sentrix Construction account, regarding the two deposits. The Bank of America Fraud Representative believed that Adams' voice was similar to Johnson's voice. Based on this information, the Bank of America Fraud Representative believed the Charles Schwab customer was a victim of fraud, and placed a hold on the second Sentrix Construction Account.

37.     On May 12, 2017, "Michael Adams" attempted to make a withdrawal from the Sentrix Construction accounts at a Bank of America branch located in Houston, Texas, but was unsuccessful because the accounts had been frozen. The Bank of America Fraud Representative e-mailed me a photograph of "Michael Adams" that was captured from bank surveillance video at the Bank of America branch in Houston, Texas on May 12, 2017. The photograph matches the

14

immigration database photograph of Jegede and also matches the person depicted in the video provided by Nunez, discussed above.

38. On May 13 and 15, 2017, "David Johnson" went to a Bank of America facility located in Houston, Texas and purchased two cashier's checks from the Vandex Construction account in the amounts of $50,000 (May 13, 2017) and $40,000 (May 15, 2017), liquidating all of the funds in the Vandex Construction account. The Bank of America Fraud Representative stated that he reviewed and compared the bank surveillance footage of "Michael Adams" on May 12, 2017 and "David Johnson" on May 15, 2017. Based on this review, the Bank of America Fraud Representative believes they are the same person.

39. On May 25, 20177 this Court issued two seizure warrants for the Bank of America accounts in the name of Sentrix Construction LLC. *See In the Matter of the Seizure of All Monies and Other Things of Value in Bank of America Checking Account Numbers xxxxxxxx2908 and xxxxxxxx8091 Held in the Name of Sentrix Construction LLC*, D.D.C. Docket Number 1:17-mj-360 (Hon. G.M. Harvey) [SEALED].

**Purchase of the Vehicles With Illegal Proceeds from Vandex Construction Account**

40. On June 13, 2017, I received copies of the above-cited cashier's checks that were withdrawn from the Vandex Construction account. The following information was listed on the checks: Bank of America cashier check number xxxxxx6002, remitter (purchased by) Vandex Construction LLC, pay to the order of RVT Automotive Group LLC, in the amount of $40,000; and cashier's check number xxxxxx6588, remitter (purchased by) Vandex Construction LLC, pay to the order of RVT Automotive Group LLC, in the amount of $50,000. RVT Automotive Group LLC is an auto dealership located in Phoenix, Arizona. Both cashier's checks were negotiated on

15

May 15, 2017 and deposited at a bank branch in Houston, Texas into a JP Morgan Chase Bank account belonging to RVT Automotive Group.

41. I have reviewed bank records for JP Morgan Chase Bank account number ending in 9761, in the name of RVT Automotive Group LLC. The bank records show the two check deposits on May 15, 2017, followed by two transfers of $40,000 and $50,000, both on May 16, 2017, into the Target Account, JP Morgan Chase Bank account number ending in 3103.

42. Later on June 13, 2017, I contacted Robert Khoshaba, Manager of RVT Automotive Group and requested information regarding the above-cited cashier's checks. Khoshaba stated that the checks were used to purchase vehicles. Khoshaba stated that a person later identified as Hassan Ademola ("Ademola"), flew from Miami, Florida to Phoenix, Arizona to purchase the vehicles. Khoshaba stated that the vehicles are still on his lot. Khoshaba stated he was suspicious of the transactions, because Ademola was attempting to expedite the transactions. Khoshaba expanded stating that the Ademola needed to purchase the vehicles as soon as possible, so that he could export the vehicles out of the United States. I requested that Khoshaba provide any and all documentation regarding the purchase of the vehicles by Ademola. I also advised Khoshaba that the vehicles were purchased with proceeds from illicit funds. I instructed Khoshaba to maintain the vehicles on his lot until this matter could be resolved.

43. On June 16, 2017, I received the following documentation from John Bennett of RVT. According to the documentation provided, on May 31, 2017 Ademola purchased a 2012 Land Rover, model Range Rover, VIN number SALME1D48CA360436, in the amount of $70,000; and a 2006 Land Rover, model LR3, VIN number SALAE24456A352565, in the amount of $20,000. Bennett also provided a copy of Ademola's Florida driver's license.

44. On June 16, 2017, the U.S. Attorney's Office issued a letter to RVT Automotive Group stating that the funds used to purchase the vehicles were derived from illegal activity, and requesting that RVT preserve the cashier's checks and any funds derived therefrom in anticipation of a judicial seizure warrant.

45. On June 19, 2017, I received a call from Khoshaba and Bennet of RVT Automotive Group. Khoshaba stated that he thought the deal was legitimate at first, but over time he believed the deal to be fraudulent, and he contacted the FBI and local police department about it. Khoshaba relayed the following additional information: Ademola contacted RVT by telephone, asking to purchase the vehicles referenced above. Ademola first deposited the $50,000 check into RVT's bank account from another state, which Khoshaba believed to be Texas. Ademola then began to create a "ruckus," and requested a refund. Khoshaba told Ademola he would not refund the money, and he also told Ademola that he owed RVT an additional $20,000 to complete the sale of the 2012 Land Rover Range Rover. Ademola then deposited $40,000 into the RVT bank account. Khoshaba stated that this raised a "red flag" and he contacted his CPA. Khoshaba's CPA told him that money laundering was involved and that Khoshaba should not give a refund to Ademola. Later on, Ademola flew to Phoenix, Arizona, to complete the sale paperwork. The next morning, a tow truck driver showed up at the RVT office and picked up one of the vehicles. After the tow truck departed RVT, Khoshaba telephonically contacted the tow truck driver and told him to return the vehicle to RVT, because Khoshaba suspected that the transaction was possibly fraudulent.

### III. CONCLUSION

46. Based on the information cited above, I believe $90,000 in illicit proceeds and funds involved in money laundering offenses were withdrawn from the Vandex Construction Bank of

America account and deposited into JP Morgan Chase Bank account number ending in 9761, and then transferred to the Target Account. I respectfully submit there is probable cause to seize the $90,000 in funds from the Target Account on the ground that the funds are derived from the proceeds of wire fraud and funds involved in actual or attempted money laundering offenses and are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) & (a)(1)(C), 982(a)(1), 984, and 28 U.S.C. § 2461(c).

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Gordon Cummings
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
this <u>5th</u> day of July 2017

_____
The Honorable Deborah A. Robinson
Magistrate Judge for the District of Columbia